**Slip Op. 02-91**

# UNITED STATES COURT OF INTERNATIONAL TRADE
_____

_____ :
: 
THOMSON MULTIMEDIA INC. :
:
Plaintiff, :
:
v. : Court No. 95-03-00277-S
:
UNITED STATES, :
:
Defendant, :
:
_____ :

[HMT on Imports does not violate the Uniformity and Port Preference clauses of the U.S. Constitution. Summary Judgment for defendant.]

Dated: August 21, 2002

deKieffer & Horgan (J. Kevin Horgan), Professor Kevin C. Kennedy, Detroit College of Law at Michigan State University, of counsel, Grunfeld, Desiderio, Lebowitz, Silverman, & Klestadt, LLP (Robert B. Silverman and Michael T. Cone), of counsel, for plaintiff.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Jeanne E. Davidson, Todd M. Hughes, and Jeffrey A. Belkin), Richard McManus Office of General Counsel, United States Customs Service, of counsel, for defendant.

## **OPINION**

**RESTANI, Judge:**

This matter is before the court on Plaintiff's motion and Defendant's cross-motion for judgment on the agency record pursuant to USCIT Rule 56.2. Plaintiff Thomson Multimedia

Inc. ("Thomson") brought action against Defendant, the United States Customs Service ("Customs" or the "government"), to recover the Harbor Maintenance Tax ("HMT") collected on its electronics imports since 1992. Thomson argues that the HMT on imports is unconstitutional because: (1) the HMT on imports is not severable from the HMT on exports found to be unconstitutional in United States Shoe Corp. v. United States, 523 U.S. 360 (1998); (2) the HMT on imports violates the Uniformity Clause, U.S. Const. art. I, § 8, cl. 1; and (3) the HMT on imports violates the Port Preference Clause, U.S. Const. art. I, § 9, cl. 6.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(i), the court's residual jurisdiction provision. See Thomson Consumer Electronics, Inc. v. United States, 247 F.3d 1210 (Fed. Cir. 2001). Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, shows no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. USCIT R. 56(c).

## BACKGROUND

The HMT was enacted as part of the comprehensive Water Resources Development Act of 1986, Pub. L. 99-662, 100 Stat. 4082 ("WRDA"), and is specifically contained in the Harbor Maintenance Revenue Act of 1986, Pub. L. 99-662, 100 Stat. 4266. 26 U.S.C. §§ 4461-62 (1994). The HMT imposes an ad valorem charge of 0.125 percent of the value of the commercial cargo involved in any port use of federally maintained navigable waterways. 26 U.S.C. § 4461(b). The term "port" is defined as "any channel or harbor (or component thereof) in the

United States, which . . . (i) is not an inland waterway, and (ii) is open to public navigation." 26 U.S.C. § 4462(a)(2)(A). The Harbor Maintenance Trust Fund ("HMT Fund") was established for revenue raised by the HMT to be expended on the operation and maintenance of channels and harbors. 26 U.S.C. § 9505.

The Inland Waterway Fuel Tax ("IWFT") is also a component of the WRDA and is contained in the Inland Waterways Revenue Act of 1978, Pub. L. 95-502, 92 Stat. 1696. The tax is imposed "on any liquid used during any calendar quarter by any person as fuel in a vessel in commercial waterway transportation." 26 U.S.C. § 4042(a) (1994). For the purpose of the IWFT, commercial waterway transportation only occurs on inland or intracoastal waterways, as defined in 33 U.S.C. § 1804 (1994).[1] See 26 U.S.C. § 4042(d)(1). The Inland Waterway Trust Fund ("IW Fund") was established for revenue raised by the IWFT to be expended on the inland and coastal waterways of the United States. 26 U.S.C. § 9506.

## DISCUSSION

### A. Severability

Thomson argues that the HMT on imports should be declared invalid because it is not

---

[1] 33 U.S.C. § 1804 identifies 27 rivers as inland and intracoastal waterways for the purposes of the IWFT. The list of these waterways includes segments of the: (1) Alabama-Coosa Rivers, (2) Allegheny River, (3) Apalachicola-Chattahoochee and Flint Rivers, (4) Arkansas River (McClellan-Kerr Arkansas River Navigation System), (5) Atchafalaya River, (6) Atlantic Intracoastal Waterway, (7) Black Warrior-Tombigbee-Mobile Rivers, (8) Columbia River (Columbia-Snake Rivers Inland Waterways), (9) Cumberland River, (10) Green and Barren Rivers, (11) Gulf Intracoastal Waterway, (12) Illinois Waterway (Calumet-Sag Channel), (13) Kanawha River, (14) Kaskaskia River, (15) Kentucky River, (16) Lower Mississippi River, (17) Upper Mississippi River, (18) Missouri River, (19) Monongahela River, (20) Ohio River, (21) Ouachita-Black Rivers, (22) Pearl River, (23) Red River, (24) Tennessee River, (25) White River, (26) Willamette River, and the (27) Tennessee-Tombigbee Waterway.

severable from the unconstitutional HMT on exports. Thomson's claim fails because the Federal

Circuit has "specifically held that the unconstitutional export provision in the HMT is severable

from the remainder of the statute." Amoco Oil Co. v. United States, 234 F.3d 1374, 1377 (Fed.

Cir. 2000) aff'ing 23 CIT 613, 63 F. Supp. 2d 1332 (1999) (citing Princess Cruises, Inc. v.

United States, 201 F.3d 1352, 1358 (Fed. Cir. 2000); Carnival Cruise Lines, Inc. v. United States,

200 F.3d 1361 (Fed. Cir. 2000)).

**B.  Uniformity Clause**

The Uniformity Clause provides that, "[t]he Congress shall have Power To lay and collect

Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the Common Defense and

general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform

throughout the United States . " U.S. Const. art. I, § 8, cl. 1. Thomson argues that, because the

HMT provides exemptions for certain ports, Customs does not apply the tax uniformly and,

therefore, the HMT is unconstitutional.

**1.  Tax v. User Fee**

As an initial matter, the government argues that the HMT on imports is a user fee, not a

tax, and therefore the Uniformity Clause cannot apply. A user fee is a charge designed as

compensation for government-supplied services, facilities, or benefits. See Pace v. Burgess, 92

U.S. 372, 375 (1876). In U.S. Shoe, the Court rejected the argument the HMT on exports is a

user fee finding that "the connection between a service the Government renders and the

compensation it receives for that service must be closer than is present here." U.S. Shoe, 523

U.S. at 369 (holding that the HMT on exports is a tax). Defendant argues that the Supreme

Court's user fee analysis was limited to the export provision and, therefore, is not binding.

Assuming arguendo that the Court's holding in U.S. Shoe applies only to the export provision, this court has already determined that the HMT on the whole is a tax. United States Shoe Corp. v. United States, 19 CIT 1284, 907 F. Supp. 408 (1995) (analyzing the HMT under Massachusetts v. United States, 435 U.S. 444 (1978)), aff'd, 114 F.3d 1564 (Fed Cir. 1994). In Massachusetts, the Court looked at three factors to determine whether a charge is a user fee: (1) the charge must not discriminate against the constitutionally-protected interest; (2) the implementing authority must base the charge upon a fair approximation of the use of some system; and (3) the charge must be structured to produce revenue fairly apportioned to the total cost to the government of the benefits conferred. 435 U.S. at 467-70.

In U.S. Shoe, this court found that the HMT failed the second and third prong of the Massachusetts Test. 19 CIT at 1292, 907 F. Supp. 2d at 415. "First, the charge is not based upon some fair approximation of the cost of the benefits port users receive from harbor maintenance and development projects." Id. (reasoning that low value bulk cargo importers and exporters use port facilities to a much greater extent than high value non-bulk cargo importers and exporters, yet, the cost to the latter is greater than that to the former). "Second, the charge is excessive in relation to the cost to the government." Id.[2] (reasoning that the tax is used to fund projects yet to be commenced, rather than to repay the government for services rendered). This analysis applies equally to the HMT on imports and exports and the court finds no reason to reject it. The court finds the HMT is a tax in its entirety, as it is not a fair approximation of the

---

[2] In U.S. Shoe Corp. v. United States, 114 F.3d 1564 (Fed. Cir. 1997), the Court affirmed this court's conclusion regarding the second prong of the Massachusetts Test. It found that, "the HMT is not based on a fair approximation of use and, as such, is not a permissible user fee." Id. at 1574.

cost of the benefits to importers and the charge is excessive in relation to the cost to the government.

## 2. Geographic Discrimination

The Supreme Court has never relied upon the Uniformity Clause to invalidate a statute. The clause was first addressed in the Head Money Cases, where a federal statute levied a charge against carriers for each foreign passenger brought into the United States by seaport, though no charge was levied for foreign passengers crossing over inland borders. Edye v. Robertson, 112 U.S. 580, 594 (1884). In upholding the tax, the Court found that a "tax is uniform when it operates with the same force and effect in every place where the subject of it is found." Id. In Knowlton v. Moore, the Court again rejected a Uniformity Clause claim on grounds that the clause merely limits "the imposition of a tax by the rule of geographical uniformity, not that in order to levy such a tax objects must be selected which exist uniformly in the several States." 178 U.S. 41, 108 (1900). There have been few subsequent challenges under the Uniformity Clause.

In the Reg'l Rail Reorganization Act Cases, the Supreme Court addressed a similar uniformity provision found in the Bankruptcy Clause, Article I, Section 8, Clause 4 of the Constitution.[3] 419 U.S. 102, 159 (1974). The Court held, "[t]he uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems." The Court extended this analysis to the Uniformity Clause in Ptasynski v. United States, 462 U.S. 74, 83

---

[3] "Congress shall have Power ... To establish ... uniform Laws on the subject of Bankruptcies throughout the United States."

n.13 (1983) ("Although the purposes giving rise to the Bankruptcy Clause are not identical to those underlying the Uniformity Clause, we have looked to the interpretation of one Clause in determining the meaning of the other.").

In Ptasynski, the Court first laid out the essential test for determining the constitutionality under this clause. "Where Congress defines the subject of a tax in nongeographic terms, the Uniformity Clause is satisfied." Id. at 84. The court went on explain that, even if Congress frames a tax in geographic terms, the court may only declare a tax invalid if it results in "actual geographic discrimination." Id. at 85. This examination is undertaken with the understanding that "[t]he Uniformity Clause gives Congress wide latitude in deciding what to tax and does not prohibit it from considering geographically isolated problems." Id. at 84. At issue in Ptasynski was a tax exemption for Alaskan oil[4] contained in the Crude Oil Windfall Profit Tax Act of 1980, 26 U.S.C. §§ 4986-4998 (repealed). The Court concluded that the Alaska oil exemption reflected "[Congress'] considered judgment that unique climatic and geographic conditions require that oil produced from this exempt area be treated as a separate class of oil." Id. at 79.

Under Ptasynski, this court reviews the HMT for actual geographic discrimination and gives considerable deference to Congress and its consideration of geographically isolated problems. The court will invalidate the HMT under the Uniformity Clause only where it finds

---

[4] Exempt Alaskan oil is defined by 26 U.S.C. § 4994(e) as, any crude oil (other than Sadlerochit oil) which is produced "(1) from a reservoir from which oil has been produced in commercial quantities through a well located north of the Arctic Circle, or (2) from a well located on the northerly side of the divide of the Alaska-Aleutian Range and at least 75 miles from the nearest point on the Trans-Alaska Pipeline System." Id. at 78.

that Congress' purpose was to promote regional favoritism or discrimination.[5]

### a. Alaska and Hawaii Domestic Cargo Exemption

Thomson challenges the special rule for Alaska and Hawaii domestic cargo contained in the HMT.[6]  Thomson argues that the rule is a geographic exemption that results is discrimination. Thomson is likely correct that the exemption for Alaska and Hawaii cargo is framed in geographic terms.  Plaintiff, however, fails to show actual favoritism or discrimination.  Under Ptasynski, the court must analyze the geographic exemption to determine whether, by enacting the exemption, Congress was attempting to address a geographically isolated problem.

---

[5] Though Congressional deference is significant, it is not absolute.  In Downes v. Bidwell, 182 U.S. 244 (1901), the Court found if Puerto Rico were a part of the United States for the purpose of the Uniformity Clause, a tax on goods originating in Puerto Rico would be a violation of the clause.

[6] The HMT contains a special rule for merchandise transported to and from Alaska, Hawaii, and any possession of the United States, by which no tax is imposed on:

(A) cargo loaded on a vessel in a port in the United States mainland for transportation to Alaska, Hawaii, or any possession of the United States for ultimate use or consumption in Alaska, Hawaii, or any possession of the United States,

(B) cargo loaded on a vessel in Alaska, Hawaii, or any possession of the United States for transportation to the United States mainland, Alaska, Hawaii, or such a possession for ultimate use or consumption in the United States mainland, Alaska, Hawaii, or such a possession,

(C) the unloading of cargo described in subparagraph (A) or (B) in Alaska, Hawaii, or any possession of the United States, or in the United States mainland, respectively, or

(D) cargo loaded on a vessel in Alaska, Hawaii, or a possession of the United States and unloaded in the State or possession in which loaded, or passengers transported on United States flag vessels operating solely within the State waters of Alaska or Hawaii and adjacent international waters.

26 U.S.C. § 4462(b).

As noted in Amoco, 63 F. Supp. 2d at 1339 n.15, Congress included the Hawaii domestic cargo exemption in response to Congressional concern that Hawaii presented an isolated geographical problem.[7]   The court finds that by providing an exemption for domestic cargo movement to and from Alaska and Hawaii, Congress was addressing a geographically unique problem in two states where domestic consumption is heavily dependent on ocean transportation. With Alaska and Hawaii's disproportionate dependence on ocean transportation for domestic consumption and transportation of merchandise to the remainder of the United States, Congress' exemption for the tax on the value of domestic merchandise is narrowly tailored toward relieving the burden of the ad valorem tax.  Congress did not extend the exemption to foreign imports into Hawaii and Alaska or exports from Hawaii and Alaska.[8]   As held in Amoco, "[t]he Alaska and Hawaii exemptions were enacted to prevent, not encourage geographic discrimination." Amoco, 63 F. Supp. 2d at 1339.

Conceding that Hawaii is likely dependent upon shipping for domestic transportation because, Thomson argues that, despite its remote Northern location, Alaska does not exhibit the features of an island and should not receive the same unique treatment as Hawaii.  At oral argument, Thomson pointed out that the only evidence that Alaska is disadvantaged was

---

[7] "[V]irtually everything going in and out [of Hawaii] must travel by ship.... A port user fee, therefore, would be levied on over 80% of all the states goods and materials." Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing Before the House Committee on Ways and Means on H.R. 6, 99th Cong. 30 (1985).

[8] The special rule of intrastate passengers of U.S. flag vessels has not been addressed by the parties in any detail, but Hawaii is a series of islands and overland transportation in Alaska is problematic.

provided by one Alaskan Senator near the close of debate on the WRDA.[9]  The inclusion of

Alaska in the special rule, however, occurred following Senator Stevens' statements to the

Senate, and following the detailed discussion on Hawaii's problems.  It must be inferred that

Congress found his argument that Alaska represented a geographically isolated problem

convincing and not unlike the Hawaii situation.  Consistent with Amoco, the court finds that

Plaintiff fails to show actual discrimination or favoritism with respect to the special rule for

Alaska and Hawaii domestic cargo.

### b.  Columbia River

Thomson next challenges what it argues is an implied exemption for a small portion of

the Columbia River.  The HMT defines the term port as including "the channels of the Columbia

River in the States of Oregon and Washington only up to the downstream side of Bonneville lock

and dam."  26 U.S.C. § 4462(a)(2)(C).  Meanwhile, the IWFT on the inland waterway portion of

the Columbia River only extends "[f]rom The Dalles at RM 191.5 to Pasco, Washington

(McNary Pool), at RM 330, Snake River from RM 0 at the mouth to RM 231.5 at Johnson Bar

Landing, Idaho."  33 U.S.C. § 1804(8).  Thomson contends that, based on the geographic

---

[9] Senator Stevens of Alaska described:

Alaska's size, widely dispersed population, and geographic location combine to put fairly unique demands on our transportation system...Surface transportation in Alaska is almost exclusively waterborne.  For much of Alaska waterborne shipping is the only way to get materials to communities where they will be used.  These communities are almost entirely dependent on waterborne commerce for their basic supplies...We cannot recognize the unique needs of commerce with the islands and yet ignore the other State which is similarly situated.  Waterborne shipments are an essential part of life in my home State.  It is as much a part of Alaska's commerce as it is Hawaii's or any other place which is geographically isolated."

132 Cong. Rec. S2739-02, S2825, 99th Cong. 2d Sess. (Mar. 14, 1986).

boundaries of these two provisions, the HMT and IWFT fail to cover a 47.5 mile stretch of Columbia River running upstream from the Bonneville lock and dam.  Because the IWFT does not extend to the Bonneville lock, Thomson argues there are three ports along the Columbia River that are not subject to either the HMT or IWFT.[10]  In support of their claim of actual discrimination, Thomson implied that the absence of legislative history explaining this anomaly somehow suggests that Congress had a hidden agenda to benefit ports along this stretch of river.  Thomson's claim fails for several reasons.

First, the court will not presume that the absence of explanatory legislative history implies bad faith or discrimination.  It is entirely likely that omission of this area from the WRDA funding scheme was an oversight.  In Amoco, the court found that the so-called Columbia River exemption was more like a geographic definition than an exemption, with the section of the Columbia River that "is more like a port to be defined as a port and the portion of the river that is more like an inland waterway defined as such."  Amoco, 63 F. Supp. 2d at 1340.  Plaintiff submits no support for its contrary theory of intentional discrimination or favoritism.

Second, Plaintiff has failed to establish that these ports actually benefit from increased trade and, therefore, has failed to establish actual discrimination or favoritism.  Thomson does not indicate that any of these "exempt" ports were defined as the subject of the HMT, nor does it make any showing that their features are consistent with those of an HMT port.  Even if these ports were HMT ports for the purposes of the Uniformity Clause, Plaintiff has submitted no

---

[10] The United States argues that only two ports are exempt (Hood River and Bingen, but not Dalles), that neither is engaged in any significant shipping commerce, and cargo at those ports would be exempt from both charges only if no other domestic port was involved, and if the shipment entered and left the port through the downstream portion of the Columbia River.

evidence that these three ports currently benefit or will benefit from any gap in the WRDA scheme. While the court does not know the purpose of this omission, the court finds no evidence suggesting actual discrimination and favoritism. As discussed in Amoco, the Columbia River exemption is benign.

### c. Exemptions Related to Inland Waterway Ports

Thomson next challenges the HMT under the Uniformity Clause based on other aspects of the HMT's overlapping relationship with the IWFT, including: (1) a claim that there are 378 shallow draft ports that are not subject to the IWFT, but eligible to receive funds from the HMT Fund; (2) fund appropriations from the IW Fund are limited to specific lock and dam construction, rehabilitation, and modernization projects along the inland waterway system, whereas fund appropriations from the HMT Fund are used for projects relating to both harbor maintenance and inland waterway projects; (3) where any part of a vessel's itinerary includes an inland waterway, that vessel is exempt from the HMT; and (4) the IWFT exempts deep-draft vessels, enabling deep-draft vessels to avoid both taxes when part of its itinerary includes an inland waterway. Thomson argues that these exemptions create an unconstitutional competitive advantage for certain ports.

In Augusta Towing Co. v. United States, 5 Cl. Ct. 160 (1984), the United States Claims Court upheld the IWFT definition of inland waterway against a Uniformity Clause challenge, on the grounds that defining inland waterway as 26 specific inland waterways was rational and not discriminatory. At oral argument, Thomson attempted to distinguish the present case from Augusta Towing, contending that the Uniformity Clause analysis was different in Augusta Towing because the charge was found to be a user fee. Whether it was required to do so or not,

the court examined the IWFT, "to determine whether the <u>tax</u> is uniform," "assuming that the Uniformity clause is applicable." <u>Id.</u> at 163 (emphasis added). The court found, "that the selection of the 26 waterways was not the result of any [deliberate combinations of states in Congress to secure improper advantages to themselves at the expense of other states]." <u>Id.</u> at 171. The court finds <u>Augusta Towing</u> persuasive.

As with the definition of inland waterway under the IWFT, the HMT definition of port use as, "any channel or harbor . . . which (i) is not an inland waterway, and (ii) is open to public navigation," 26 U.S.C. § 4462(a)(2)(A), does not appear to be the result of deliberate discrimination in favor of a majority of states. The fact that various exemptions may interact to create competitive advantages for certain ports is not deliberate geographic favoritism or discrimination. Plaintiff submits no evidence that deep draft vessels actually benefit from the exemption. Importantly, Plaintiff does not explain how the purpose of a vessel-specific exemption could be construed as geographically discriminatory in the sense required for a successful Uniformity Clause challenge.

Further, in order to be defined as a port under the HMT, the facility must receive federal funding. 26 U.S.C. § 4462(a)(1)(B). Plaintiff does not claim that 378 shallow draft ports unfairly receive funding but, instead, argues that some facilities are "eligible" to receive funding and, therefore, may receive the benefit of HMT funds without being subject to HMT charges. Plaintiff cites no support for the proposition that these facilities presently benefit from any discrimination, much less geographic discrimination. The court finds that Thomson has failed to show the actual geographic discrimination or favoritism prohibited by the Uniformity Clause.

**C. Port Preference Clause**

The Port Preference Clause provides that, "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear, or pay Duties in another." U.S. Const. art. I, § 9, cl 6. "The origins of the Uniformity Clause are linked to those of the Port Preference Clause. The two were proposed together, and reported out of a special committee as an interrelated limitation on the National Government's commerce power. They were separated without explanation...." Ptasynski, 462 U.S. at 81 n.10 (citations omitted). "The preference clause of the Constitution and the uniformity clause were, in effect, in framing the Constitution, treated, as respected their operation, as one and the same thing, and embodied the same conception."[11] Knowlton, 178 U.S. 106.

As with the Uniformity Clause, "[the Port Preference Clause] has never been relied on by the federal judiciary to hold an act of Congress unconstitutional." Kansas v. United States, 16 F.3d 436, 439 (D.C. Cir. 1994), cert. denied, 513 U.S. 945 (1994). In the authoritative case on the Port Preference Clause, Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. 421 (1856), the Supreme Court interpreted the clause narrowly, holding that direct discrimination, and not disparate effects, violates the Port Preference Clause. Wheeling, 59 U.S. 421. Further, "[w]hat is forbidden is not discrimination between individual ports within the same or different States, but discrimination between States." Wheeling, 59 U.S. at 424. More recently, in Houston v. Federal Aviation Admin., 679 F.2d 1184, 1197 (5th Cir. 1982), the 5th Circuit found that

---

[11] There are two significant differences, however, in the application of the Port Preference Clause. First, it forbids only discrimination along state lines, while the Uniformity Clause does not have this limitation. Second, the Port Preference Clause is a limitation on the regulation of commerce, as well as taxation.

government actions do not violate the Port Preference Clause even if they result in some

detriment to a port, where they occur (1) as incident to some otherwise legitimate government act

regulating commerce or (2) more as result of accident of geography than from intentional

government preference.

In Amoco, 63 F. Supp. 2d at 1341, this court found that a violation of the Port Preference

Clause requires that an act of Congress explicitly discriminate against the ports of a particular

state.[12]  In that case, Amoco never alleged that Congress explicitly discriminated against any

particular state.  In the present case, however, Thomson alleges explicit discrimination by

Congress.  First, it alleges that the exemption for domestic cargo at the ports of Alaska and

Hawaii provides an explicit preference for those two states and against the remaining forty-eight.

Thomson next argues that by defining port to exclude ports along inland waterways, Congress

provides an explicit preference for all of the ports of those twenty states that only have inland

waterway ports.

The court finds that Thomson's reading of the Port Preference Clause fails to

acknowledge the intent of the framers.  The clause, "gave small states protection against

deliberate discrimination against them by other, more powerful states."  Houston, 679 F.2d at

1198.  In devising an appropriate test for determining a violation of the Port Preference Clause,

the court follows the clear intent of the framers and the guidance of the Supreme Court in

Ptasynski, 462 U.S. at 84-85, regarding its test for determining a violation of the Uniformity

Clause.

---

[12] The court cited City of Milwaukee v. Yeutter, 877 F.2d 540, 546 (7th Cir. 1989) ("For two hundred years courts have understood that only explicit discrimination violates the Port Preference Clause").

Where an act of Congress does not provide a preference for all of the ports of one state, over all of the ports of another, there is no violation of the Port Preference Clause.  See Wheeling, 59 U.S. at 424.  But, where Congress does provide such a preference, the Court must look closely at the legislation to discern whether Congress intended to channel commerce toward all of the ports of a favored state or, instead, was attempting to address a geographically isolated problem.  See Ptasynski, 462 U.S. at 84-85.

### 1.  Exemption for Hawaii and Alaska

Thomson contends that the Port Preference Clause is a complete barrier to any express preference for all of the ports of one state over all of the ports of another.  By exempting Alaska and Hawaii domestic cargo, Congress arguably granted an express preference to those two states. Under Thomson's interpretation of the Port Preference Clause, there is no room for Congress to address a geographically isolated problem exacerbated by a generally applicable statute, if Congress must utilize state borders to do so.

In United States v. Lopez, 514 U.S. 549, 587 (1995) (Thomas, C., concurring), Justice Thomas stated, "the more natural reading is that the (Port Preference Clause) prohibits Congress from using its commerce power to channel commerce through certain favored ports."  Far from channeling commerce through all the ports of Alaska and Hawaii and away from all of the states where HMT ports are not exempt from domestic movement of cargo, Congress appeared to address a problem of geographic isolation.  The Alaska and Hawaii domestic cargo exemption is designed to offset the increased costs of the HMT associated with domestic cargo in the two states that are not contiguous with the rest of the United States.  In its deliberations, Congress considered whether the HMT would have a disproportionate impact on domestic commerce in

Alaska and Hawaii. Water Resources Conservation, Development, and Infrastructure Improvement Act of 1985: Hearing Before the House Committee on Ways and Means on H.R. 6, 99th Cong. 30 (1985).

That Congress attempted to address an isolated problem of geographical origin is supported by two components of the Alaska and Hawaii domestic cargo exemption. First, as is clear from the statute, only domestic cargo movements, not international cargo movements, are exempt. 26 U.S.C. § 4462(b)(1). The ports of Alaska and Hawaii are given no competitive advantage in attracting imports from foreign countries or in exporting, as internationally they are similarly situated to the remainder of the United States. Thomson does not suggest that shippers channel domestic cargo away from other ports, toward the limitedly exempt ports of Alaska and Hawaii. Second, all ports in all states are exempt from the HMT on domestic merchandise that travels to or from Alaska or Hawaii. This aspect of the exemption clearly indicates that Congress intended to encourage domestic commerce with Alaska and Hawaii because of their isolation, rather than channel commerce toward the ports of favored states. The court finds that the Alaska and Hawaii domestic cargo exemption is narrowly tailored to meet the isolated problems of two states that are uniquely dependent on ocean transportation for domestic merchandise and would be disproportionally impacted by the HMT, save for the exemption, and, therefore, the exemption does not violate the Port Preference Clause. [13]

### 2. Exemption for Ports Along Inland Waterways

Thomson argues that by defining ports to exclude ports located along inland waterways,

---

[13] The court does not reach the issue of the severability of the exemption from the HMT statute.

and thus exempting twenty states that only contain inland waterways ports, the HMT provides an explicit preference for all of the ports of those states, in violation of the Port Preference Clause. Thomson's reading of the Clause is inconsistent with the holding in Augusta Towing, 5 Cl. Ct. 160, where a challenge to the IWFT was brought on the grounds that all of the ports in certain states are being taxed, while none of the ports of other states are being taxed. In that case the court found, "[w]hile it may be true that the ports of some states are indirectly disadvantaged compared to the ports of other states because fuel used on the waterways leading to them is taxed, this fact does not bring the tax within the constitutional prohibition. Id. at 165. Further, "[a]cts of Congress that only incidentally benefit some ports at the expense of others do not confer a preference on the ports of one state over those of another within the meaning of the clause." Augusta Towing, 5 Cl. Ct. at 165. The court sees no reason why these principles should not apply here.

In enacting the HMT, Congress taxed cargo at ports of every coastal state in the same manner, excluding from the definition of "port" those ports located along inland waterways, for the purpose of avoiding double taxation at ports that are on waterways subject to the IWFT. Making fuel on vessels at certain ports located along inland waterways subject to the IWFT, and cargo at certain deep-water ports subject to the HMT, is a rational attempt by Congress to avoid the adverse consequences of different laws operating on merchandise on the same vessel. The HMT definition of port use with its exemptions represents a rational choice by Congress and is not improperly geographically discriminatory. It is thus constitutional under the Port Preference Clause.

**CONCLUSION**

Accordingly, the court finds that the HMT on imports is a tax, severable from the unconstitutional HMT on exports, and constitutional under the Port Preference Clause and Uniformity Clause.  It is hereby ordered that Defendant's motion for summary judgment is granted.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

This 21st day of August, 2002.